## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: TODD S. HORLBECK,<br><br>    Debtor. | Case No. 18-cv-06650<br><br>Judge Martha M. Pacold |
| TILLMAN ENTERPRISES, LLC,<br><br>    Appellee-Cross-Appellant,<br><br>      v.<br><br>TODD S. HORLBECK,<br><br>    Appellant-Cross-Appellee. | On appeal from the U.S. Bankruptcy Court for the Northern District of Illinois, Eastern Division<br><br>Bankr. Case No. 15 B 28696<br><br>Judge Janet S. Baer |

## MEMORANDUM OPINON AND ORDER

The Bankruptcy Code generally gives a debtor a "fresh start" by permitting him to discharge his debts through bankruptcy proceedings. *Bartenwerfer v. Buckley*, 143 S. Ct. 665, 670 (2023). This policy inures to the benefit of the "honest but unfortunate debtor," not one who obtained credit through dishonest means. *Jendusa-Niclai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012) (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (emphasis omitted)). The dishonest borrower must pay his debts even if he has filed for bankruptcy.

This appeal requires deciding whether a reasonable factfinder could conclude that Todd Horlbeck falls on the "honest" side of this divide.

### I

### A

Debtor, defendant, appellant, and cross-appellee Todd Horlbeck ran a hedge fund called HCM L.P. that closed during the financial crisis of the late aughts. In the face of nosediving asset prices, Horlbeck intentionally inflated the net asset value of investors' shares in the fund's quarterly statements from Q4 2007 through Q4 2008. App. 241 ¶¶ 15–16.[1] It turned out that Horlbeck had been misstating the

---

[1] Like the parties, the court uses the appendices filed along with each party's opening brief to refer to the record. The standard appendix is labeled as "App." and refers to the

value of HCM for at least the first three quarters of 2007 as well, though the parties dispute whether these 2007 misstatements were intentional, reckless, or neither. App. 862. During 2007 and 2008, Horlbeck and other limited partners took distributions from HCM to which they were entitled, but those distributions were pegged to the inflated value of the fund that Horlbeck reported, not the actual value of the securities the fund held. App. 864. When HCM closed in April 2009, Horlbeck returned only a fraction of the investors' money. *See* App. 826 ¶¶ 31–32.

One group of investors in HCM was the Tillman family. Warner Tillman ("Warner"), the family representative in its dealings with Horlbeck, had a financial relationship with Horlbeck that lasted from 1992 until HCM's liquidation in 2009. *See* App. 334. When Horlbeck opened HCM in 2002, Tillman family members and entities started to invest as limited partners at Warner's direction. App. 480–81 ¶¶ 6–7. All told, the Tillmans invested $3,120,000 in HCM between December 2002 and January 2008. App. 480–81 ¶ 7.

In April 2009, Horlbeck notified the limited partners of HCM that he was liquidating the fund. Horlbeck returned $554,162.42 to Warner and the Warner Tillman Trust. App. 61 ¶ 32. This was over $1.1 million less than the $1.7 million they invested. *Id.* The record does not indicate how much, if anything, other members of the Tillman family lost, nor is there evidence as to losses by any other Tillman entities.

Horlbeck wrote a letter to Warner in May 2009, informing him that there had been "performance and reporting inaccuracies" in the quarterly statements, but that the inaccuracies had not affected the amount of Warner's final distribution.[2] Months later, in August 2009, Horlbeck informed some limited partners that he had "discovered" errors with the net asset values reported in HCM's quarterly statements and that partners who had taken distributions had been "inadvertently" overpaid nearly $500,000 total. App. 306. Horlbeck told Warner that HCM owed the family entity additional money, but to receive it, family members would need to sign releases of claims against him, and the family would only receive a promissory note in exchange. *Id.*

---

documents numbered [10-1] to [10-5] on this court's docket. Tillman filed its own appendix, which includes critical record documents that were not included in Horlbeck's appendix. Any time the court references these documents, they are labeled with "Tillman App." This refers to the documents numbered [11-1] to [11-7] on this court's docket.

[2] This letter is not in the record on appeal based on this court's review. The bankruptcy court referenced the letter in its decision, and the quotation comes from the bankruptcy court opinion, which cites the Adversary Docket, [106-2] at 19–20. *Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 827 (Bankr. N.D. Ill. 2018). Searching the adversary docket on its own, the court also found this quotation, though it comes from an undisputed statement of facts rather than the actual letter itself.

2

At that point, the Tillmans retained an attorney to negotiate a settlement with Horlbeck and to investigate him. In November 2009, Horlbeck reached out to his investors again, telling them that he had received most of the settlements and releases back, attaching photocopies of checks that would be sent once holdouts executed their releases. App. 307. These checks were not for the full amounts owed, and Horlbeck again offered to sign promissory notes for the remainders. *Id.* Later in November, Horlbeck pressed Warner to settle and release his claims. App. 308. Horlbeck threatened to file for bankruptcy in the alternative. *Id.*

Horlbeck and the Tillmans eventually settled after a 14-month negotiation. In exchange for a release of all claims arising out of the family's investments in the hedge fund and Horlbeck's management of the fund, Horlbeck paid the Tillmans $22,500 and signed a promissory note for $1,242,500 to be paid over 20 years to Tillman Enterprises, LLC ("Tillman") as the representative of the family. App. 312 ¶ 3a.–b. The settlement required Horlbeck to provide a financial affidavit disclosing his assets and liabilities. App. 314 ¶ 8f.

The Tillmans signed the agreement on September 27, 2010, though their attorney held it pending Horlbeck's provision of several items, including the financial affidavit. App. 317–19; Tillman App. 584–85. The Tillmans' attorney sent Horlbeck's attorney a copy of the agreement on October 14, 2010, and instructed Horlbeck's attorney to hold the agreement in escrow "subject to our receipt and approval of the documents from [Horlbeck]." Tillman App. 586. Horlbeck signed the financial affidavit that day, disclosing his and his wife's assets and liabilities. However, the financial affidavit omitted approximately $1.3 million in contingent liabilities in the form of promissory notes that Horlbeck had used to settle claims with other investors. *Compare* Tillman App. 605 (all boxes for contingent liabilities checked "no" on Horlbeck financial affidavit), *with* App. 68 ¶ 73 (answer admitting that Schedule F of Horlbeck's bankruptcy petition includes promissory note debts to other creditors for around $1.3 million incurred prior to the execution of the financial affidavit).

B

Horlbeck's management of HCM drew the attention of the fund's limited partners like the Tillmans, but it also raised eyebrows at FINRA, a Delaware corporation that Congress and the SEC have authorized to police the broker-dealer industry as a self-regulatory organization. *See* 15 U.S.C. § 78o-3; *Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 571 & n.1 (2d Cir. 2011). Beginning in June 2009, and throughout the subsequent two years, Horlbeck and his broker-dealer, Cantella, answered questions from FINRA about HCM through counsel. App. 849–56, 861–64, 883–97, 907–10. Critically for this case, Horlbeck admitted in his first set of responses to FINRA's questions that

3

in an effort to make the fund's performance appear better than it was, [he] reported a valuation to the partners that was not accurate. Thereafter, for each quarter in 2008, [he] reported to partners a valuation that was better than the actual valuation because the vast majority of partners were locked into the fund and could not take any withdrawals or liquidate their positions during the calendar year.

App. 863.

Horlbeck referred to FINRA in at least three communications with Warner Tillman during 2010. In a February email, Horlbeck told Warner that FINRA would likely call about their email communications, but Horlbeck encouraged Warner not to say much, stating, "discussing less, or nothing, rather might be the safest course of action." App. 440. A March email informed Warner that Horlbeck had engaged an attorney for his "dealings" with FINRA. App. 441. And a July email told Warner that he should only go to FINRA as a "last resort" and that if Warner contacted FINRA, it would end Horlbeck's career. App. 901–02. None of these emails disclosed the extent or nature of the FINRA investigation, or that Horlbeck had admitted to FINRA that he intentionally understated losses on HCM's quarterly statements to avoid investor panic and that he and other limited partners had taken distributions pegged to the inflated net asset value of the fund.

FINRA's investigation of Horlbeck lasted over two years, culminating in an on-the-record interview and eventually, a letter of acceptance, waiver, and consent that FINRA accepted in December 2011. In that letter, Horlbeck admitted that he had violated FINRA's rules by understating losses on account statements he sent to investors, and as a result, he agreed to an indefinite bar on association with any FINRA member. Tillman App. 608–12. This effectively ended Horlbeck's career in the securities investment industry.

C

Returning to procedural developments in this case: Horlbeck failed to make payments under the promissory note, so Tillman sued Horlbeck for breach of contract in state court in October 2013. App. 68 ¶ 70. Horlbeck filed a chapter 7 bankruptcy petition, the matter at issue here, in August 2015. *In re Todd S Horlbeck*, No. 15-28696 (Bankr. N.D. Ill. Aug. 21, 2015), ECF No. 1. The state court dismissed the breach-of-contract case without prejudice due to Horlbeck's bankruptcy petition. App. 68 ¶ 71.

Schedule F to the bankruptcy petition lists, among other debts, nearly $1.3 million owed to several creditors incurred in 2008 and 2009. *Id.* ¶ 73. It also lists Tillman Enterprises as a creditor for a promissory note in the amount of $1.1 million. *Id.* ¶ 72.

4

Tillman Enterprises brought a three-count adversary complaint in Horlbeck's Chapter 7 bankruptcy proceedings asserting that a debt he owed to it was not dischargeable because Horlbeck incurred the debt via fraud. App. 13–20 ¶¶ 71–122. Count I of the adversary complaint states that the debt is not dischargeable under 11 U.S.C. § 523(a)(19) (securities law violations). Count II states that it is not dischargeable under § 523(a)(2)(A) (fraudulent representation or omission). And Count III states that it is not dischargeable under § 523(a)(2)(B) (fraudulent written statement as to financial condition). After Tillman amended its complaint in response to Horlbeck's motion to dismiss, the parties engaged in discovery and filed cross motions for summary judgment.

The bankruptcy court granted summary judgment to Horlbeck on Count I, and to Tillman on Count III. *See Horlbeck*, 589 B.R. at 825. Though Tillman did not move for summary judgment on Count II, the court granted it sua sponte. *Id.* at 841–42. In granting summary judgment to Tillman on two of the three counts, the effect of the court's order is that the debt is not dischargeable. Indeed, summary judgment in Tillman's favor on only one count would have the same result. Horlbeck filed a notice of appeal and Tillman cross appealed on Count I.

### D

This court does not need to reach whether the bankruptcy court's resolution of Counts I and II was correct. On Count III, the bankruptcy court held that Horlbeck's debt to Tillman Enterprises is not dischargeable because a reasonable factfinder could only conclude that the debt was induced using a fraudulent written statement as to financial condition. That holding was correct, so the bankruptcy court's judgment is affirmed.

### II

The legal standard for deciding summary judgment motions in adversarial bankruptcy proceedings is the same as in ordinary civil cases. Fed. R. Bankr. P. 7056. Under that standard, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] The substantive law controls which facts are material. *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323.

---

[3] The court uses the term "factfinder" because the parties do not discuss whether any trial in bankruptcy court would be in front of a jury or judge.

After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and footnotes omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

Because this case involves cross-motions for summary judgment on Count III, the court views "all facts and inferences in the light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (quoting *Wis. Alumni Rsch. Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010)).

III

Tillman's third count in the adversary complaint alleges that the debt incurred under the promissory note and settlement agreement is not dischargeable under 11 U.S.C. § 523(a)(2)(B). To prevail on a claim under § 523(a)(2)(B), a creditor must prove that the debtor obtained the debt using a statement that was (1) in writing; (2) materially false; (3) respecting the debtor's or an insider's financial condition; (4) relied on by the creditor; and (5) made with intent to deceive. *See Fischer Inv. Cap., Inc. v. Cohen (In re Cohen)*, 507 F.3d 610, 612 (7th Cir. 2007).

Tillman's claim in Count III is based on Horlbeck's financial disclosure related to the settlement agreement and promissory note. Tillman claims that it relied on the information contained in the financial disclosure in deciding to extend Horlbeck credit in the form of the promissory note, that the disclosure omitted the existence of substantial contingent liabilities Horlbeck owed to other investors, and that Horlbeck omitted these contingent liabilities with the intent to deceive.

Below, Horlbeck challenged Tillman's summary judgment motion on the materiality, reliance, and intent prongs. *Horlbeck*, 589 B.R. at 842. On appeal, Horlbeck focuses on the reliance prong only. (Horlbeck phrases some arguments as being about materiality, but they are about actual reliance.)

The reliance prong under § 523(a)(2)(B) has two parts—the creditor must have actually relied on the debtor's false written statement and that reliance must have been reasonable. *Webster Bank, Nat'l Ass'n v. Contos (In re Contos)*, 417 B.R. 557, 566 (Bankr. N.D. Ill. 2009); 4 Collier, *supra*, § 523.08[2][d].

6

A reasonable factfinder could only conclude that Tillman Enterprises reasonably relied on Horlbeck's financial affidavit, so Tillman is entitled to summary judgment on Count III.

### A

At his deposition, Warner Tillman stated that had he known Horlbeck had the contingent liabilities that Horlbeck omitted from the financial disclosure, he would not have entered into the settlement agreement, because "there was probably no way he would be able to pay me." App. 384. On appeal, Horlbeck does not challenge that he omitted these liabilities, that the omissions were material, or that if Tillman *had* relied on the financial affidavit, that reliance would have been unreasonable. Horlbeck's only claim is that this statement that Warner made in his deposition statement was not true.

To get there, Horlbeck relies on a basic timeline. Warner signed the settlement agreement (on Tillman Enterprises' behalf) on September 27, 2010. App. 317–19. However, Horlbeck did not execute the settlement agreement and tender the financial disclosure until October 14, 2010, more than two weeks later. App. 742. So according to Horlbeck, it would have been logically impossible for Tillman to rely on the financial statements when extending credit because Warner signed the settlement agreement two weeks earlier.

On its surface, this argument makes perfect sense. But as the bankruptcy court explained below, it omits the relevant context and communications between the parties. Once considered, that context shows why there is no genuine dispute on actual reliance.

On September 27, 2010 (the date that the Tillmans signed the settlement agreement), the Tillmans' attorney sent an email noting that Horlbeck had to sign the financial affidavit and have the signature notarized before the settlement could move forward. Tillman App. 585. On October 14, 2010, the Tillmans' attorney sent Horlbeck's attorney the executed copies of the settlement agreement and various resolutions. Tillman App. 586. In that email, the attorney stated, "I am forwarding to you to hold in escrow subject to our receipt and approval of the documents from your client." *Id.* The attorney also noted that final exhibits would have to be inserted into the settlement agreement. *Id.*

Warner's deposition testimony combined with these email communications shows that there is no genuine issue that Tillman Enterprises relied on the financial affidavit when deciding to extend Horlbeck credit. As the bankruptcy court put it, "[t]he information contained in the Affidavit was clearly material to Tillman for purposes of entering into the Settlement Agreement and Promissory Note." *Horlbeck*, 589 B.R. at 844.

B

Horlbeck makes five points in opposition to this conclusion, but none of the five is persuasive. *First*, Horlbeck argues that because the Tillmans signed the settlement agreement in advance of receiving the financial affidavit, they (and by extension the LLC adversary plaintiff) could not have been relying on the financial affidavit. That is not the case. Their attorney specifically instructed Horlbeck's attorney to hold the agreement in escrow pending their "approval" of the financial affidavit. Tillman App. 586. Horlbeck identifies no record evidence that the Tillmans' approval of the information in that affidavit was not an actual component of Tillman Enterprises' choice to extend credit.

*Second*, Horlbeck argues that Tillman "was aware" of the existence of other promissory notes prior to entering into the settlement agreement due to Horlbeck's November 2009 letters, App. 307–08, and so Tillman either could not (or should not) have relied on the financial affidavit that omitted these liabilities. [13] at 15. To begin, this argument reads as being more about whether Tillman's reliance was reasonable, not whether it actually relied on the truth and completeness of the financial affidavit. And Horlbeck did not raise this point until his reply brief, so the argument is waived. *Compare* [10] at 40–43, *with* [13] at 15–16; *see Catalina Hldgs. (Bermuda) Ltd. v. Hammer*, 378 F. Supp. 3d 687, 697 (N.D. Ill. 2019) (arguments not raised until reply are waived). Even considering the argument's merits, however, it is a red herring. The Tillmans had no way of knowing the terms of any other promissory notes, and by not listing them on the financial affidavit, Horlbeck was swearing that they did not exist. Even considering the November 2009 letters, Tillman's reliance on the sworn financial affidavit rather than negotiating emails from 11 months in the past was not unreasonable.

Horlbeck's argument runs into a logical problem too: He asks this court to hold—as a matter of law—that Tillman should have believed his representations in his November 2009 letters, and then *not* believed a financial affidavit, witnessed by a notary and sworn to be true, that Horlbeck had no contingent liabilities. The court will not do so. Instead, it holds that to the extent the argument was preserved, Tillman's reliance on the sworn financial affidavit that lacked contingent liabilities was reasonable, even in light of Horlbeck's earlier representations.

*Third*, Horlbeck argues that Tillman's argument for actual reliance is based on inadmissible evidence, namely hearsay. "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Horlbeck's evidentiary argument is arguably sound, as the email discussing holding the agreement in escrow potentially contains hearsay that falls within none of the exceptions. In Horlbeck's view, the communication was from Tillman's lawyer to Horlbeck's lawyer; it was not made in court; and it is being offered for the

truth of the matter asserted, that Tillman needed to approve the outstanding documents before allowing the agreement to move forward. *See* Fed. R. Evid. 801(c)(1)–(2).

Nevertheless, Horlbeck also waived this argument by waiting until his reply brief to raise it on appeal. *See United States v. Waldrip*, 859 F.3d 446, 450 n.2 (7th Cir. 2017). It is true that arguments raised for the first time in a reply are not waived if the appellee's brief raises the issue in the first instance. *See Loja v. Main St. Acquisition Corp.*, 906 F.3d 680, 684 (7th Cir. 2018). But that exception to the ordinary rules of appellate presentation is inapplicable here. The bankruptcy court considered and rejected Horlbeck's evidentiary argument. *Horlbeck*, 589 B.R. at 831. Horlbeck did not raise it in his opening brief in this court. In fact, Horlbeck did not address the "escrow email" at all in his opening brief. Instead, Tillman argued in favor of affirmance on Count III using the "escrow email" and Horlbeck responded by re-raising the evidentiary objection. *See* [11] at 21–22; [13] at 17–18.

Ordinarily, courts apply the reply-brief-only waiver rule to ensure the opposing party an opportunity to respond to all arguments. *See White v. United States*, 8 F.4th 547, 552–53 (7th Cir. 2021). And here, Tillman filed another brief after Horlbeck's reply. [14]. Horlbeck might argue that Tillman had such an opportunity, and this case presents an ill fit for the rule. But the standard rule applies in this case because, as required by Bankruptcy Rule 8016(c)(4), Tillman's final brief addressed only the cross-appeal on Count I. Thus, Tillman could not respond to Horlbeck's belated hearsay argument in compliance with the Bankruptcy Rules.

*Fourth*, Horlbeck characterizes Warner's deposition statement that he relied on the financial affidavit as a conclusory statement insufficient to support granting summary judgment. [13] at 18 (citing *Bordelon v. Bd. of Educ. of City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (discussing required facts to *defeat* a summary judgment motion, not support one)); *see also* [10] at 42–43. Considered in the relevant context, Warner's statement was not conclusory. Warner also explained that had Horlbeck disclosed all of his contingent liabilities, Warner would have changed his mind about entering into the settlement agreement because he would have doubted that Horlbeck had "enough money . . . to pay us." App. 384. Thus, it was not simply a conclusory statement insufficient to defeat Horlbeck's summary judgment motion. Combined with the record evidence of the request to hold the settlement agreement in escrow, it is enough on which to grant summary judgment in favor of Tillman.

*Fifth*, Horlbeck makes contractual arguments about the effect of Tillman's attorney's request to hold the agreement in escrow and its reliance on the financial affidavit. Both points are inapposite to the only preserved question on Count III—whether Tillman actually relied on the financial affidavit.

As to the email requesting to hold the agreement in escrow, Horlbeck claims that the settlement agreement was fully integrated, so as a legal matter, the "escrow" request is irrelevant and does not render the settlement ineffective. In one sense, Horlbeck is correct—the escrow request does *not* render the settlement ineffective. Instead, it is a core reason why Horlbeck's debt is not dischargeable. The email is evidence supporting the *factual* point that Tillman relied on the truth of the financial affidavit before allowing the settlement to go forward. That the text of the settlement agreement did not provide for an escrow period is irrelevant to the factual reliance question in this case.

As to Horlbeck's argument that the settlement did not provide for reliance on the financial affidavit, his point is somewhat unclear. Horlbeck argues that the agreement provided a remedy in the event the financial affidavit was false: acceleration of payment on the promissory note. But it is unclear how this undermines Tillman's contention that it relied on the affidavit when extending credit. The inclusion of remedies in the settlement agreement, in fact, cuts the other direction. There would be no reason for a contract to require one party to provide a financial affidavit and build in remedies in the event the affidavit was false if the affidavit's contents did not matter to the counterparty. The simple fact that the agreement penalized Horlbeck if his affidavit was false does not serve to benefit him now as he tries to have the debt incurred under the agreement discharged in bankruptcy.

\*

In conclusion, Horlbeck preserved only his argument that Tillman did not actually rely on the false financial statement when agreeing to extend credit. But the record shows no genuine dispute of material fact. A reasonable factfinder could conclude only that Tillman relied on the truth of the affidavit when releasing its claims against Horlbeck in exchange for the promissory note. Thus, the bankruptcy court correctly granted Tillman summary judgment.

IV

Because Tillman Enterprises is entitled to summary judgment on Count III, this court affirms the bankruptcy court's order that Horlbeck's debt is not dischargeable.

Dated: August 25, 2023                     /s/ Martha M. Pacold